In the matter of the last will and testament of ISAAC GLUCKMAN.

[Decided September 20th, 1916.]

1. The evidence in this case *held* to show the will was properly and sufficiently declared and published.

2. In the case of an illiterate testator, the burden of proof is upon the proponent to show that the testator understood the contents of the will and approved of them.

3. A will must be the testator's freely-intended act; a will drawn by mistake is no more the testamentary act of the testator than a will the product of undue influence.

4. Under the evidence in this case—*Held*, that the testator understood the contents of his will, and approved of them.

87 N. J. Eq. In re Gluckman's Will.

On appeal from the Hudson county orphans court.

*Mr. Elmer W. Demarest* and *Mr. Lindley M. Garrison,* for the appellants.

*Mr. Clarence Linn* and *Mr. Max Levy,* for the caveators (respondents).

*Mr. Aaron A. Melniker* and *Mr. Joseph Noonan,* for Rose Gluckman (the widow), respondent.

LEWIS, VICE-ORDINARY.

The appeal in this matter is from an order of the Hudson county orphans court, denying probate of the will of Isaac Gluckman, deceased, said order being dated November 16th, 1915. Caveats to the will were filed by the brother and sister of the decedent, and while the widow did not join therein nor file a separate caveat, she was represented in the proceedings in the orphans court by counsel, who took the chief part in attacking the validity of the document offered for probate.

The two questions raised were—*first,* whether there had been a sufficient publication of the paper in question as a will in accordance with the statute, and *second,* whether the paper presented for probate expresses the intention of the testator. The orphans court found against the former of these contentions, but sustained the latter, and refused to admit the will to probate. The testator was a Hebrew, who had come to this country from Russia. He was about forty-five years of age at the time of his death, which occurred on March 19th, 1915, two days after he had been operated upon for appendicitis. He was married about twenty-five years ago, and leaves his widow, Rosa, or Rosie, surviving him. They never had any children. From the time of their marriage they lived constantly in Bayonne. Gluckman was, originally, a carpenter, but soon after his marriage he went into the building business; and a year or two later opened a hardware store in Bayonne and continued in that business until his retirement in May, 1914. During all of that period he devoted his attention chiefly to speculation and invest-

ments in real estate.    Mrs. Gluckman conducted the business in
the hardware store, without any help of any sort.    During her
entire married life she never had a servant but once, and that
was only for two months.    When she married Gluckman he had
no money and she loaned him what money she had to start him
in business.    Gluckman, at the time of his death, was seized in fee
of real estate which, according to an appraisement which he had
made for his own information, was worth $250,000.    It yielded
him a monthly rental of about $1,675 from ninety-two or ninety-
three tenants.    The property was encumbered by mortgages ag-
gregating $101,000.    There were also outstanding and maturing
notes amounting to $16,000, and there were overdue taxes in the
sum of $9,000.    The value of the property, if sold and all debts
paid off, might net $100,000, more or less.

On the 1st of December, 1911, the testator had Mr. Horace
Roberson, a lawyer of Bayonne, New Jersey, draw up a will for
him, in which he left everything to his wife, Rosa Gluckman,
her heirs and assigns forever, with the exception of three lega-
cies, namely, $5,000 to his brother, Samuel Gluckman; $5,000
to his sister, Betsey Gollin, and $1,000 to a sister-in-law in
Russia.    That will is still in existence.

Four years later, on March 15th, 1915, he had an attack of
appendicitis, and two days later the doctors decided that he must
be operated upon without delay.    Doctor Corwin told him that
they must act right away, and the testator replied:    "I must
have a couple of hours, anyway; I want to send to Judge Rob-
erson to make my will."    On Mr. Roberson's arrival, he found
the testator in bed, and he told his counsel that he wanted to
make a will and to write down his instructions.    Counsel then
made a memorandum, which was produced at the trial, and
reads as follows:

"All to Mrs. G. for life
"R-A-M- Ex.
"All to $40 pr week
"Not to move fm House
"till she die
"Aftr her death
"to home for
"Old"

Counsel then left the bedroom and proceeded to draw up the will. In less than half an hour he returned to the bedroom with two witnesses. Counsel says that he read the will slowly to the testator in the presence of the. witnesses, and signed by the testator and the witnesses in the presence of each other. The will reads as follows:

"I, Isaac Gluckman of the City of Bayonne, in the County of Hudson and State of New Jersey, being of sound and disposing mind and memory, hereby make, publish and declare my last will and testament as follows:
"First: I direct that all my just debts and funeral expenses be paid by my executors as soon as reasonable after my death.
"Second: I give, devise and bequeath all the rest, residue and remainder of my estate, real, personal or mixed, of whatever it may consist and wherever it is situate, to my executors in trust, to take possession of the same and to collect all rents and other assets, and if they deem it advisable to sell, convey and mortgage any or all my real estate in such manner and on such terms as they may deem best, and out of the income of my estate pay to my wife a weekly allowance of forty dollars and such other sum and sums as may be necessary during the term of her natural life. She shall remain in and occupy our present residence as long as it shall be her pleasure to do so. After the death of my wife Rosa said executors shall turn over the entire residue of my said estate to any home for aged people that my said wife may designate in a last will and testament or any paper-writing in the nature thereof, and if she shall fail to do so, then to such institution as my said executors deem advisable. This provision for my wife is in lieu of dower in my estate.
"Third: I hereby make, constitute and appoint my friends John Herman Mahnken, Charles E. Annett and Horace Roberson executors of this my last will and testament, hereby revoking all other wills by me made.
"IN WITNESS WHEREOF, I have hereunto set my hand and seal this seventeenth day of March, nineteen hundred and fifteen.
"ISAAC GLUCKMAN. (Seal)
"Signed, sealed, acknowledged and declared by the said testator as and for his last will and testament in the presence of us (both being present at the same time), who, at his request, in his presence and in the presence of each other, have hereunto subscribed our names as witnesses.
"WILLIAM COHEN, Bayonne, N. J.
"LOUIS ZEEK, Bayonne, N. J."

The brother and the sister of the testator, who would, under the former will of 1911, receive legacies of $5,000 each, are the caveators.

The two attesting witnesses swear that they did not know it was a will that they were witnessing, but the court below would not believe them, and accepted the testimony of Mr. Roberson,

that the paper was properly and sufficiently declared and published as a will. As the court below heard all the testimony in the case, he was in a better position. to judge as to the truth or falsity of their statement than I, and I have no hesitation in sustaining him on that branch of the case.

In regard to the second branch of the case, I have had very much greater difficulty. The testator said, first of all, "Rosie to have the use of everything for life, the whole income for life."

It will be noted that that clause does not appear in the will.

The testator was an illiterate man. He could neither read nor write. The burden of proof, therefore, is on the proponent to satisfy the court that he understood the contents of the will and approved of them. The law requires the will to be the testator's freely-intended act; a will drawn by mistake is no more the act of the testator than a will obtained by undue influence. A will may be drawn by the attorney in a manner different from that in which the testator intended it to be drawn, yet, if the testator under such circumstances fully understood what had taken place, and approved the same, it would be his will. Or a case might arise where the testator intended the will to be as it was drawn, but labored under a misapprehension as to the legal effect of the will as drawn, caused, perhaps, by the bad advice of his attorney. And, in such cases, it seems to be the rule that the will must stand as drawn, excepting in cases where the testator cannot read nor write for any reason. *Collins* v. *Elstone (1893), L. R. Prob. 1 (England)*.

In the case in hand, I do not see the slightest reason to suspect Mr. Roberson of having committed a fraud on the testator. He took notes of what his client desired to be done. He had acted for the testator in all his legal matters for twenty-five years, and he proceeded to write out a will which he thought would best comply with the testator's wishes. The testator had been given opiates by his doctor; but the doctor testified that the effect had passed away at the time he made his will. The fact that the testator delayed the operation for several hours in order to make his new will, is clear evidence that he was dissatisfied with the terms of the old will. It is evident that he was de-

*87 N. J. Eq.*          In re Gluckman's Will.

termined that his brother and sister and sister-in-law, to whom he had left legacies in the will of 1911, should not benefit by his death. What the scrivener figured out to be the testator's intentions is not important; that is the duty of the court. Straws show which way the wind blows. After the execution of the will, after leaving his bedroom, he showed great emotion on leaving his wife and told her that he had left everything to her. There is no doubt in my mind that he thought that under the will she would get all the income during her lifetime; in fact, I am very much inclined to believe that he labored under the delusion, common among persons unversed in law, that a life tenant can do as he pleases with the property, and that only in the event that there is anything left, does it go to the remainderman. This is an exceedingly common delusion, and would hardly be recognized in a court of equity on the question of the construction of the will. Still, it is a fact that should be borne in mind by men who are called upon to draw up wills.

On the other hand, it may well be that the testator had a strong aversion to some other man marrying his wife after his death and enjoying the proceeds of his labor and frugality, and, therefore, did not wish her to have more than was just enough to make her comfortable during the rest of her days.

The testator, some time preceding his death, had bought a large house, and there is testimony to show that he intended to leave that house as a home for aged Hebrews. It is a perfectly natural thing to leave money for the upkeep of such an institution. I am very loth to refuse probate to such an excellent will. It means that during all the centuries of the future there will be one less "home for the aged" in the land. However, the proponent, owing to the illiteracy of the testator, must prove to the satisfaction of the court that the testator fully understood the contents of the will and approved them.

In the case of *Andreas* v. *Weller et al., 3 N. J. Eq. 604,* which is a very similar case to the one we are now dealing with, the ordinary held that an omission made by a scrivener in preparing a will of real estate cannot be supplied by parole evidence.

Mr. Roberson testified, on his cross-examination in the orphans court, as follows:

"Q. What did you do about it?

"A. After he told me all to his wife for life, and then afterwards said the income would not be enough to keep her on while the debts were pressing him, he told me about the $40.00 a week, 'and as much more as is necessary.' I interpreted that instruction of his meant a modification of the first instruction, and I gave it legal force in that form. That was my interpretation, and I disregarded the first instruction.

After an appeal had been taken from the decree of the orphans court to this court, the parties consented to allow Mr. Roberson to add the following statement to his testimony:

"Then afterwards, when I had consented to become one of the executors to the will, Mr. Gluckman said to me, 'Now, make it this way: Give Rosie $40.00 a week, and as much more as is necessary.' I construed this instruction to mean, that the testator had revoked his former instructions given to me. After I had drawn the will and I read to the testator the provision giving the widow $40.00 a week and such other sums as should be necessary, and explained to him that the will as drawn would permit the executors to give and allow her the whole income after the debts were paid, he said 'All right; that's good.' "

Of course, on the face of it, that was a clear misrepresentation; the attorney clearly misrepresented the effect of the instrument; and I am not satisfied that the proponents have established the fact that the testator fully understood the contents of the will and approved thereof, which duty is cast upon them by the law in the case of those who cannot read or write for any reason.

*1 Schoul. Wills (5th ed.)* § *317*, says:

"The civil law required that the written will of a blind person should be read over to him and approved by him in the presence of the subscribing witnesses. Our common law lays down no such imperative rule, but with regard to both blind and illiterate, and all who cannot read what is written out as their will, requires satisfactory proof to the effect that the testator knew and approved of the contents of the will which was executed as his own. Such a will may be read over to the testator before signing, apart from his witnesses; or it may be shown that the contents were correctly made known to him without any formal reading at all, provided it appear, on the whole, that the instrument as drawn up and executed constituted his own testamentary disposition as intended by him. Less than this, however, is unacceptable; and where the will, without being read over or examined, is signed by the testator upon an assurance that it has been prepared according to his instructions, when in point of fact it has not been, probate should be refused."

See *Day* v. *Day, 3 N. J. Eq. 549; Harris* v. *Vanderveer's Executor, 21 N. J. Eq. 561; Lyons* v. *Van Riper, 26 N. J. Eq. 339; Kahl* v. *Schober, 35 N. J. Eq. 466; Patton* v. *Hope, 87 N. J. Eq. 527; Elkinton* v. *Brick, 44 N. J. Eq. 158; Hildreth* v. *Marshall, 51 N. J. Eq. 250.*

The decree of the court below will be affirmed and probate of the will refused.